[Civ. No. 33517. First Dist., Div. One. Apr. 23, 1976.]

DONALD F. ELDRIDGE, Plaintiff and Appellant, v.
CITY OF PALO ALTO, Defendant and Respondent.

[Civ. No. 34134. First Dist., Div. One. Apr. 23, 1976.]

HARRY "J" BEYER, JR., Plaintiff and Appellant, v.
CITY OF PALO ALTO et al., Defendants and Respondents.

614

COUNSEL

Cliff & Nowinski, Frank B. Cliff, Peter A. Nowinski, Crist, Crist, Griffiths, Bryant & Schulz, Frank Lee Crist, Jr., and Chilton H. Lee for Plaintiffs and Appellants.

Fulop, Rolston, Burns & McKittrick, Marvin G. Burns, Pollock, Williams & Berwanger, John P. Pollock, Charles V. Berwanger and John T. Harris as Amici Curiae on behalf of Plaintiffs and Appellants.

Robert K. Booth, Jr., City Attorney, Jackson, Turner & Mulcare, William J. Turner, Ronald J. Mulcare, Atkinson, Farasyn & Smith, Atkinson, Farasyn, Smith & Caploe, Fred Caploe, Vatuone, Dok, Daiker, Randall & Bryant and Norman E. Matteoni for Defendants and Respondents.

Evelle J. Younger, Attorney General, Carl Boronkay, E. Clement Shute, Jr., Assistant Attorneys General, Nicholas C. Yost and Richard C. Jacobs, Deputy Attorneys General, Harry I. Fenton, John B. Matheny and Edward J. Connor, Jr., as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

**ELKINGTON, J.**—These appeals, with similar subject matter and issues, have been consolidated for the purpose of our consideration and disposition of them.

Plaintiffs Eldridge and Beyer were the owners, respectively, of 750 acres and 22.27 acres of generally unimproved land in the foothills of the City of Palo Alto (hereafter the "City"). The City had enacted zoning ordinances which, among other things, classified their property as "permanent open space and conservation lands."

Plaintiff Beyer thereafter commenced an action against the City and its council and council members. The complaint alleged, inter alia, that the effect of the ordinances was to arbitrarily, unreasonably, and by means of excess regulation and in contravention of the state Constitution (art. I, former § 14) and federal Constitution (5th and 14th Amends.), take and damage his property for public use without compensating him therefor. He prayed for damages in inverse condemnation or, in the alternative, that the ordinances be declared "illegal, unconstitutional and void as applied to [his] property."

Plaintiff Eldridge also filed a complaint with similar allegations, against the City alone. The only relief sought by him, however, was for damages in inverse condemnation; he conceded the ordinances' validity.

The superior court sustained the City's general demurrers in each of the actions and, over objection, denied leave to amend the complaints. Each of the plaintiffs has appealed from a judgment which was thereafter entered dismissing his action.

A preliminary question is presented. May a zoning ordinance operate so oppressively upon affected property owners as to require payment of compensation in an action for inverse condemnation? Or, in such a case, is the landowner's sole remedy an action to invalidate the ordinance, at least as to himself, on constitutional or other grounds? It will be seen that if the latter is the exclusive remedy, plaintiff Eldridge's complaint stated no cause of action, as did plaintiff Beyer's insofar as it sought damages in inverse condemnation.

The United States Supreme Court tersely discussed this subject in *Penna. Coal Co.* v. *Mahon* (1922) 260 U.S. 393, 415 [67 L.Ed. 322, 326, 43 S.Ct. 158, 28 A.L.R. 1321]. It said: *"The general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."* (Italics added.)

More recently the same court in *Goldblatt* v. *Hempstead* (1962) 369 U.S. 590 [8 L.Ed.2d 130, 82 S.Ct. 987], citing *Penna. Coal Co.* v. *Mahon, supra*, held that "the form of regulation [can] be so onerous as to constitute à taking *which constitutionally requires compensation."* (Italics added.)

No express holding of this state's Supreme Court on the subject is to be found. But nevertheless the following decisions of that court bear upon the problem.

*Klopping* v. *City of Whittier* (1972) 8 Cal.3d 39 [104 Cal.Rptr. 1, 500 P.2d 1345]. Discussing "de facto taking cases," the court declared (p. 46) that before such a "taking results there must be a 'physical invasion or direct legal restraint. . . .' One example of a 'legal restraint' discussed in several California cases has been a particularly harsh zoning regulation, . . ." This recital reasonably must mean that a valid, but particularly harsh, zoning regulation may give rise to damages in inverse condemnation, for if the regulation were invalid it could have no effect giving rise to such damages.

*HFH, Ltd.* v. *Superior Court* (1975) 15 Cal.3d 508 [125 Cal.Rptr. 365, 542 P.2d 237]. The petitioners of that case sought inverse condemnation damages resulting from a down-zoning ordinance which drastically reduced their property's market value, but nevertheless allowed a substantial and reasonable beneficial use. They urged (p. 516, fn. 13) "that the injury constituting the taking was the reduction in market value of the land." The high court found the dismissal of their action, upon the

sustaining of a demurrer to their complaint, to have been proper. It was made clear by the court (p. 514) that the ruling was predicated on pleadings where the zoning ordinance's "only alleged effect was a diminution in the market value of the property in question." In such a case there would be no injury or at least no legal or compensable injury. But the court held (p. 516, fn. 13): "If such a reduction constituted an injury, *it would occur regardless of the legality of the zoning action occasioning it*; . . ." (Italics ours.)

California's Legislature has also recognized that an unreasonably drastic open-space zoning ordinance, although otherwise valid, may result in a taking requiring "just compensation therefor." (Gov. Code, § 65912.)

And the state's Court of Appeal has frequently reached similar conclusions.

*Aaron* v. *City of Los Angeles* (1974) 40 Cal.App.3d 471 [115 Cal.Rptr. 162] (cert. den., 419 U.S. 1122 [42 L.Ed.2d 822, 95 S.Ct. 806]). Here the court affirmed a judgment holding the defendant city liable. in damages for inverse condemnation, occasioned by excessive jet aircraft noise from a municipally operated airport. Relied upon were several "California cases [holding] that zoning restrictions intended to facilitate the operation of an airport and to protect the approaches to it may constitute a taking of property." (P. 481.)

*Gisler* v. *County of Madera* (1974) 38 Cal.App.3d 303, 306 [112 Cal.Rptr. 919]. "In certain factual situations it is difficult to draw a precise line between a noncompensable injury resulting from the enactment of a valid [zoning] regulation under the police power [citations] and [such] regulations which are beyond the limits of the police power and can only be justified as a 'taking' under the power of eminent domain which requires just compensation [citations]."

*People* ex rel. *Dept. Pub. Wks.* v. *Southern Pac. Trans. Co.* (1973) 33 Cal.App.3d 960, 966 [109 Cal.Rptr. 525]. Here the court stated: "A zoning restriction imposed to depress value with a view to future eminent domain proceedings itself creates a cause of action in inverse condemnation against the governmental unit enacting the zoning ordinance. [Citations.] The zoning restriction may be invalidated by a direct attack."

*Turner* v. *County of Del Norte* (1972) 24 Cal.App.3d 311, 315 [101 Cal.Rptr. 93]. "Despite the conclusion that the zoning ordinance is valid as a reasonable exercise of the police power, the appellants would still be entitled to compensation if there was a taking of their property."

*Peacock* v. *County of Sacramento* (1969) 271 Cal.App.2d 845, 854 [77 Cal.Rptr. 391]. A zoning ordinance as " 'applied to plaintiffs' lands [deprived them] of any practical, substantial or beneficial use thereof.' " A judgment against the county for damages in inverse condemnation was affirmed.

*Sneed* v. *County of Riverside* (1963) 218 Cal.App.2d 205, 212 [32 Cal.Rptr. 318]. The court found no fault in an inverse condemnation action where it was the "county which has invaded the alleged property rights of plaintiff, and in response thereto plaintiff does not challenge the constitutionality of the ordinance but merely seeks damages in inverse condemnation. . . ."

Lower federal courts have also held that an action in inverse condemnation will lie when a valid zoning ordinance is "exceptionally restrictive," or "arbitrary and capricious," or "allows no reasonable use of plaintiff's property."

*Brown* v. *Tahoe Regional Planning Agency* (D.Nev. 1973) 385 F.Supp. 1128, 1132. "[P]ublic welfare and necessity may reasonably require exceptionally restrictive land use classification . . . but . . . such valid regulations may nevertheless constitute a taking of private property for public use entitling the owner to just compensation."

*Dahl* v. *City of Palo Alto* (N.D.Cal. 1974) 372 F.Supp. 647. This case dealt with precisely the zoning ordinances and issues concerned in the appeals at hand. Rejecting the city's motion to dismiss, the court held that the complaint stated a cause of action for damages in inverse condemnation.

*Arastra Limited Partnership* v. *City of Palo Alto* (N.D.Cal. 1975) 401 F.Supp. 962. This case also concerned the zoning ordinances and foothills here at issue. Following a trial on the merits the court held that the plaintiff had established a right to damages on the theory of inverse condemnation.

■ We opine, from a consideration of the foregoing authority, that a valid zoning ordinance may nevertheless operate so oppressively as to amount to a taking, thus giving an aggrieved landowner a right to damages in inverse condemnation.

We are brought to the question whether the zoning ordinances here at issue may reasonably be found to be of that class.

The relevant facts are stated by us as they were pleaded in the complaints. But since, as previously indicated, the City's demurrers were sustained without leave to amend over plaintiffs' objections, we consider at their request other relevant matter of which the trial court could have taken judicial notice.[1] In a demurrer the trial court will properly treat such matters, if otherwise relevant and material, as having been pleaded. (*Weil* v. *Barthel* (1955) 45 Cal.2d 835, 837 [291 P.2d 30].) The matters in question embrace related resolutions, reports, and other official acts of the City. (See Evid. Code, § 452.)

Until 1959 the City lay entirely upon a flat alluvial plain in northern Santa Clara County. It was then almost fully developed, with nearly 14,000 residence units occupying 2,483 acres. During that year about 6,000 acres of privately owned and virtually undeveloped foothills to the west were annexed by the City. The foothills which included plaintiffs' land, among other permitted uses, were promptly zoned for single-family residential use on minimum *one-acre* sites.

During the year 1969 the City commenced land-use studies of its foothills. Two years later it "adopted an amendment to its General Plan re-classifying over 90% of the undeveloped foothills" (over 5,900 acres, including plaintiffs' land) to "Open Space and/or Conservation and Park" uses. Thereafter by successive ordinances plaintiffs' land was rezoned to "O-S (Open Space)."

Thereafter a "Staff Report On Regulation To Preserve Foothills Open Space" was prepared by the City's director of planning and community development. Among other things, it recited:

---

[1]Where judicial notice may be taken of matter "there is still no error or impropriety in requiring evidence." (*Varcoe* v. *Lee* (1919) 180 Cal. 338, 347 [181 P. 223].)

"[T]he City Council directed the staff to pursue all available means toward achieving the open space objective in the Foothills including the exploration of methods and resources available for acquisition. This was followed by the amendment to the Palo Alto General Plan designating uses for the Foothills as open space, conservation, and/or parks which formally established the City's policy in this respect. Subsequently, the Planning Commission requested the staff to pursue ways to achieve the open space objective other than by acquisition."

"There have been various studies and lengthy deliberations by the Planning Commission and City Council focused on the Foothills during the last few years. These studies and deliberations resulted in the amendment to the General Plan to designate the Foothills for Open Space, Conservation and/or Park uses, and in the recent adoption of the Open Space Element. In consideration of the newly recognized crisis of constantly diminishing open space, implementation of the adopted policies is in order. Zoning controls to protect and preserve natural resources (including protecting against hazards), agricultural resources, recreation areas, scenic areas, watershed lands, and wildlife areas, and, particularly when situated close-in or near urbanized concentrations, are not only desirable but also necessary."

Three alternative methods for achieving the City's "open space, conservation and/or parks" goal for the foothills were submitted by the "Staff Report."

"Alternative 3" follows in substantial part:

"3. *Adopt a new zoning ordinance regulation (and apply it to the Foothills) . . . but recognizing open space as a land use of a stature equal to all other categories. Such an ordinance would be significantly more restrictive in respect to parcel size and the amount of building coverage permitted* [by an alternative plan]. *An additional regulation would put a limit* [of 3.5%] *on the total permitted impervious area. . . .*" (Italics in original.)

"Alternative 3 is innovative in that it goes beyond the traditional large lot zoning concept and recognizes open space as a valuable resource worthy of preservation for not only the present but also future generations. It allows a reasonable use of the land consistent with the open space goal in the Foothills at a 10 acre minimum lot size. Since the development controls and site and design review would prescribe how

and where the impervious areas (those areas covered by buildings, terraces, pools, roads, etc., which will not absorb rainwater) shall be placed; how the roads, structures, and other improvements shall harmonize with the existing natural landscape, and to what extent the natural landscape shall be altered by exotic landscape materials as well as the buildings and roads, therefore, the essence of the natural state of the open space will be retained. A paths and trails system will be planned which will allow public access through the Foothills lands."

"One important consideration that cannot be overlooked in any zoning proposal is the effect on the property owner. It is most important that he be allowed a reasonable use of his land. The long established 1-acre (R-E) and 5-acre (A-C) zones appear to meet this criteria without any question. At 10, 20, or 40 acres the restriction on the property owner increases. In respect to the value of the property, we can reasonably expect that large acreage mountain homes would have a definite market, particularly when located 'close-in' to the metropolitan area. In this respect, we have existing examples in the Los Altos Hills, Portola Valley, and Woodside areas.

"Considering the various environmental, ecological, aesthetic, and legal factors involved, Alternative 3 with a minimum parcel size of 10 acres is recommended as a reasonable balance between achieving the open space objectives on the one hand and allowing a reasonable (although more restricted) use of property on the other hand. It is suggested that the resultant ordinance be designated O-S, Open Space. . . "[2]

The recommended "Alternative 3" was approved and adopted by the City. The ensuing ordinances were designated, as suggested, "O-S, Open Space."

We need not set forth in full the lengthy and involved zoning ordinances of the City here under consideration. It is sufficient to say that they follow and implement the above-described plans and other activities and decisions of the City and its agencies and employees. We think it proper however to point out a few of their highlights.

The open-space land of the ordinances is the City's foothill land (including that of plaintiffs), which is "essentially unimproved or in its

[2]We have, of course, excerpted small significant portions of the "Staff Report." But, in our opinion, we have not substantially interfered with the context.

natural state," and which is designated for an "open space use." The ordinances' purpose, among other things, is to "protect and preserve [such] open space land" and to "carry out federal, state, regional, county, and city open space plans." The "open space use" of the ordinances, among other things, "means the use of land for (1) Public recreation." Among the state's "open space plans," carried out by the ordinances, is the use of such land for "outdoor recreation" and "park and recreation purposes." (See Gov. Code, §§ 65560, 65561.)

The plaintiffs alleged in their complaints, and they now contend, that by reason of the above-discussed ordinances, they were and are denied *any substantial or reasonable use of their property.*

We advert now to the principal issue before us. It concerns the proper accommodation of the rapidly developing public policy of environmental protection, to the constitutionally guaranteed right (U.S. Const., 5th and 14th Amends.; Cal. Const., art. I, former § 14) that one's "private property shall not be taken or damaged for public use without just compensation." Respected authority admonishes that: "In this conflict between the ecological and the constitutional, it is plain that neither is to be consumed by the other." (Supreme Judicial Court of Massachusetts, in *Commissioner of Natural Resources* v. *S. Volpe & Co.* (1965) 349 Mass. 104 [206 N.E.2d 666, 671].)

At the outset it should be pointed out that it is now the settled law of this state that: "[A] zoning action which merely decreases the market value of property does not violate the constitutional provisions forbidding uncompensated taking or damaging, . . ."

The rule was reiterated in such a manner by the previously discussed decision, *HFH, Ltd.* v. *Superior Court,* 15 Cal.3d 508, 518 [125 Cal.Rptr. 365, 542 P.2d 237], of the state's Supreme Court. But the court made it clear that where the zoning action goes beyond the mere diminution of market value, and instead has the substantial effect of depriving the landowner of any reasonable or beneficial use of his property, the rule will not necessarily apply.

Reviewing earlier authority the same court in *Holtz* v. *Superior Court* (1970) 3 Cal.3d 296, 303 [90 Cal.Rptr. 345, 475 P.2d 441], discussed the underlying rationale of the constitutional principles here at issue. It said: "The relevant 'policy' basis of article I, section 14, was succinctly defined in *Clement* v. *State Reclamation Board* (1950) 35 Cal.2d 628, 642 [220

P.2d 897]: 'The decisive consideration is whether the owner of the damaged property if uncompensated would contribute more than his proper share to the public undertaking.' *In other words, the underlying purpose of our constitutional provision in inverse—as well as ordinary— condemnation is 'to distribute throughout the community the loss inflicted upon the individual by the making of public improvements'* (*Bacich* v. *Board of Control* (1943) 23 Cal.2d 343, 350 [144 P.2d 818]): . . ." (Italics added.)

We observe no statutory authority for the taking of "open-space" easements or land for "open space, conservation and/or parks" under the police power and without compensation therefor. We do note, however, what appears to be legislative recognition that, at least ordinarily, such public benefit should be obtained by purchase or by eminent domain. Government Code section 51073 states: "The Legislature . . . declares that the acquisition of open-space easements is in the public interest and constitutes a public purpose for which public funds may be expended or advanced."

Considering a problem such as that presently before us the United States Supreme Court in *Penna. Coal Co.* v. *Mahon, supra,* 260 U.S. 393, 413, 415, 416 [67 L.Ed. 322, 325, 326], asserted:

"Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. As long recognized, some values are enjoyed under an implied limitation and must yield to the police power. But obviously the implied limitation must have its limits, or the contract and due process clauses are gone. One fact for consideration in determining such limits is the extent of the diminution. When it reaches a certain magnitude, in most if not in all cases there must be an exercise of eminent domain and compensation to sustain the act. So the question depends upon the particular facts. The greatest weight is given to the judgment of the legislature, but it always is open to interested parties to contend that the legislature has gone beyond its constitutional power. . . .

"The general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking. . . . We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change. As we

already have said, this is a question of degree—and therefore cannot be disposed of by general propositions."

*Penna. Coal Co.* v. *Mahon, supra,* has been widely and consistently followed and must be deemed the ruling authority on the subject before us.

The same high court in *Block* v. *Hirsh* (1921) 256 U.S. 135, 156 [65 L.Ed. 865, 871, 41 S.Ct. 458, 16 A.L.R. 165], pointed out that "there comes a point at which the police power ceases and leaves only that of eminent domain." And in *Nectow* v. *Cambridge* (1928) 277 U.S. 183, 188 [72 L.Ed. 842, 844, 48 S.Ct. 447], it said: "The governmental power to interfere by zoning regulations with the general rights of the land owner by restricting the character of his use, is not unlimited, . . ."

Apposite California authority follows.

■ "While the police power is very broad in concept, it is not without restriction in relation to the taking or damaging of property. When it passes beyond proper bounds in its invasion of property rights, it in effect comes within the purview of the law of eminent domain and its exercise requires compensation." (*House* v. *L. A. County Flood Control Dist.* (1944) 25 Cal.2d 384, 388 [153 P.2d 950].)

■ "Without question, an *undue* restriction on the use of private property is as much a taking for constitutional purposes as appropriating or destroying it." (*Candlestick Properties, Inc.* v. *San Francisco Bay Conservation etc. Com.* (1970) 11 Cal.App.3d 557, 572 [89 Cal.Rptr. 897]; italics in original.)

Courts will "inquire as to whether an ordinance which rezones property so as to restrict the uses which may be made of the property is unreasonable, oppressive or discriminatory . . . . A zoning ordinance may not be used as a device to take property for public use without the payment of compensation." (*Kissinger* v. *City of Los Angeles* (1958) 161 Cal.App.2d 454, 460, 462 [327 P.2d 10].)

Sister states have spoken similarly.

Where "plaintiffs have been deprived by the change of zone of any worthwhile rights or benefits in their land . . . the occasion is appropriate

for the exercise of eminent domain." (*Dooley* v. *Town Plan & Zon. Com'n of Town of Fairfield* (1964) 151 Conn. 304 [197 A.2d 770, 774].)

"Conditions so burdensome may be imposed that they are equivalent to an outright taking, although the title to the property and some vestiges of its uses remain in the owner. . . . [¶] Confrontation between public interests and private interests is common in the application of zoning laws, . . . and the great majority of which, upon their facts, are held to be reasonable exercise of the police power. There are, however, zoning restrictions which have been recognized as equivalent to a taking of the property restricted." (*State* v. *Johnson* (Me. 1970) 265 A.2d 711, 715 [46 A.L.R.3d 1414].)

"An unrecognized taking in the guise of regulation is worse than confiscation. . . . 'An ordinance which *permanently* so restricts the use of property that it cannot be used for any reasonable purpose goes, it is plain, beyond regulation, and must be recognized as a taking of the property. The only substantial difference, in such case, between restriction and actual taking, is that the restriction leaves the owner subject to the burden of payment of taxation, while outright confiscation would relieve him of that burden.' " (*Commissioner of Natural Resources* v. *S. Volpe & Co., supra,* 206 N.E.2d 666, 671; italics in original; and see *Arverne Bay Const. Co.* v. *Thatcher* (1938) 278 N.Y. 222 [15 N.E.2d 587, 592, 117 A.L.R. 1110].)

Summarizing broad authority, 1 Nichols on Eminent Domain (3d rev.ed. 1975) Nature and Origin of Power, section 1.42[1], pages 116-121, states: "Not only is an actual physical appropriation, under an attempted exercise of the police power, in practical effect an exercise of the power of eminent domain, but if regulative legislation is so unreasonable or arbitrary as virtually to deprive a person of the complete use and enjoyment of his property, it comes within the purview of the law of eminent domain."

Finally, on the instant issue, we note that the state's recently enacted "open-space" legislation (see Gov. Code, §§ 16140-16153, 51070-51097, 65910-65912) does not purport to enlarge the power of zoning authorities to take land for such purposes without compensation. Instead, as previously indicated, Government Code section 65912 (enacted 1970) provides: "The Legislature hereby finds and declares that this article [entitled "Open-Space Zoning"] is not intended, and shall not be

construed, as authorizing the city or the county to exercise its power to adopt, amend or repeal an open-space zoning ordinance in a manner which will take or damage private property for public use *without the payment of just compensation therefor.* This section is not intended to increase or decrease the rights of any owner of property under the Constitution of the State of California or of the United States." (Italics added.)

■ As pointed out, the gist of plaintiffs' complaints is that the City's open-space ordinances denied them any reasonable or beneficial use of their land.

Whether a zoning restriction is so "arbitrary," or "unreasonable," or "burdensome," as to transcend "proper bounds in its invasion of property rights," is ordinarily *a question of fact to be determined by trial of the issue, and not by demurrer.* (See *Wilkins* v. *City of San Bernardino* (1946) 29 Cal.2d 332, 338-339 [175 P.2d 542]; *Turner* v. *County of Del Norte* (1972) 24 Cal.App.3d 311, 314 [101 Cal.Rptr. 93]; *G & D Holland Construction Co.* v. *City of Marysville* (1970) 12 Cal.App.3d 989 [91 Cal.Rptr. 227]; *Smith* v. *County of Santa Barbara* (1966) 243 Cal.App.2d 126, 130 [52 Cal.Rptr. 292]; *Bernstein* v. *Smutz* (1947) 83 Cal.App.2d 108, 124 [188 P.2d 48]; *Dahl* v. *City of Palo Alto, supra,* 372 F.Supp. 647, 649; *Aronson* v. *Town of Sharon* (1964) 346 Mass. 598 [195 N.E.2d 341, 345].) And as said in *Penna. Coal Co.* v. *Mahon, supra,* 260 U.S. 393, 416 [67 L.Ed. 322, 326], whether in such situations, compensation is constitutionally required, is "a question of degree."

Among the many factual issues to be resolved in the cases before us is whether the 10-acre homesites of plaintiffs' land are salable at all. This question would seem to be of particular significance, since the same homesites are designated by the ordinances for "open space use," including public park and recreation purposes and "wildlife habitat." Other factual inquiries would concern: the extent, and impact, of the intrusion upon plaintiffs' property by the "paths and trails system" planned to allow "public access through the Foothill lands"; whether there is any reasonable basis for the ordinances' declared aims of encouraging agricultural usage, preserving natural resources and creating wildlife sanctuaries on the land; and generally, the reasonableness of the ordinances' concept that although the foothills may be subdivided into 10-acre homesites, they must nevertheless without compensation therefor remain "open space" according to the definitions and usages of Government Code section 65560. The resolution of these and other such

issues will determine whether plaintiffs have in fact been denied any reasonable or beneficial use of their land.

The City's demurrers, of course, raised an issue of law whether plaintiffs' complaints stated causes of action for damages in inverse condemnation. (See Code Civ. Proc., § 589; *James* v. *Superior Court* (1968) 261 Cal.App.2d 415, 416-417 [67 Cal.Rptr. 783]; 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 796, pp. 2408-2410.)

In the light of the above-related authority on the subject we are unable to say, *as a matter of law,* that plaintiffs' complaints have not stated a cause of action for damages in inverse condemnation against the City.

We are aided in this conclusion by the previously mentioned decisions, in what might be called companion cases to those before us, of *Arastra Limited Partnership* v. *City of Palo Alto, supra,* 401 F.Supp. 962, and *Dahl* v. *City of Palo Alto, supra,* 372 F.Supp. 647. Those cases, as noted, involved the same foothills, ordinances and actions of the City, and apparently the same factual and legal contentions as are presented here; it was concluded that the plaintiffs therein had pleaded causes of action for damages in inverse condemnation.

■ There remains, however, the question whether plaintiff Beyer's complaint also stated a cause of action for a judicial declaration that the ordinances were "illegal, unconstitutional and void" as applied to his property. The issue may be stated as whether the open-space and other public purposes of the City's zoning ordinances were constitutionally permissible objectives.

There appear to be no federal constitutional restraints on such objectives, according to the following authority.

*Euclid* v. *Ambler Co.* (1926) 272 U.S. 365, 386-387 [71 L.Ed. 303, 310, 47 S.Ct. 114, 54 A.L.R. 1016]. "Building zone laws are of modern origin. They began in this country about twenty-five years ago. Until recent years, urban life was comparatively simple; but with the great increase and concentration of population, problems have developed, and constantly are developing, which require, and will continue to require, additional restrictions in respect of the use and occupation of private lands in urban communities. Regulations, the wisdom, necessity and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or even half a century

ago, probably would have been rejected as arbitrary and oppressive. Such regulations are sustained, under the complex conditions of our day, for reasons analogous to those which justify traffic regulations, which, before the advent of automobiles and rapid transit street railways, would have been condemned as fatally arbitrary and unreasonable. And in this there is no inconsistency, for while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation."

*Berman* v. *Parker* (1954) 348 U.S. 26, 33 [99 L.Ed. 27, 38, 75 S.Ct. 98]. "It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled."

*Sierra Club* v. *Morton* (1972) 405 U.S. 727, 734 [31 L.Ed.2d 636, 643, 92 S.Ct. 1361]. "Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process."

The public policy of the state in reference to the subject here under consideration has been expressed by the Legislature in this manner:

Government Code section 6953 (enacted 1959): "The Legislature further declares that the acquisition of interests or rights in real property for the preservation of open spaces and areas constitutes a public purpose . . . ."

Government Code section 51072 (enacted 1974): "The Legislature hereby declares that open-space lands, if preserved and maintained, would constitute important physical, social, economic or aesthetic assets to existing or pending urban development."

The same principles were recognized and applied in *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 254 [104 Cal.Rptr. 761, 502 P.2d 1049], where the court, collecting wide authority, stated:

"Though recognition of the problem in and out of government is more pervasive today, concern over violation of our environment is not entirely a contemporary phenomenon. Four decades ago Justice Holmes

described a river as 'more than an amenity, it is a treasure. It offers a necessity of life that must be rationed among those who have power over it.' (*New Jersey* v. *New York* (1931) 283 U.S. 336, 342 [75 L.Ed. 1104, 1106, 51 S.Ct. 478].) Five years ago Justice Douglas spoke for the high court in admonishing the Federal Power Commission that the issue is not 'whether the project will be beneficial to the licensee . . . . The test is whether the project will be in the public interest'. . . in preserving reaches of wild rivers and wilderness areas . . . and the protection of wildlife.' (*Udall* v. *FPC* (1967) 387 U.S. 428, 450 [18 L.Ed.2d 869, 883, 87 S.Ct. 1712].) More recently, a circuit court discussed statutes attesting 'to the commitment of the Government to control, at long last, the destructive engine of material "progress." ' The duty of the judiciary, it held, is to assure that important environment purposes, heralded in legislative halls, are not lost or misdirected in the vast hallways of administrative bureaucracy. (*Calvert Cliffs' Coord. Com.* v. *United States A.E. Com'n* (1971) 449 F.2d 1109, 1111 [146 App.D.C. 33].) The public interest involved in a challenge to administrative action need not be economic. (*Environmental Defense Fund, Incorporated* v. *Hardin* (1970) 428 F.2d 1093, 1097 [138 App.D.C. 391].)"

It was in pursuit of the public policy expressed by the above authority that the City's zoning ordinances were enacted. We hold that they were valid exercises of the state's police power and beyond constitutional or other attack except, as indicated, in proceedings for damages in inverse condemnation. Insofar as plaintiff Beyer sought a declaration that they were constitutionally invalid, his complaint stated no cause of action.

We see no merit in the City's contention that a "comprehensive [land use] zoning ordinance" or regulation (see *Consolidated Rock Products Co.* v. *City of Los Angeles* (1962) 57 Cal.2d 515, 520-521 [20 Cal.Rptr. 638, 370 P.2d 342]) is in some way immune from the application of the rule of *Penna. Coal Co.* v. *Mahon, supra,* 260 U.S. 393, 415 [67 L.Ed. 322, 326], and its kindred cases, that where the "regulation goes too far it will be recognized as a taking." No authority is offered or found so holding.

The same argument was made in *Dahl* v. *City of Palo Alto, supra,* 372 F.Supp. 647, 648, where the court responded: "Defendant's principal argument as to the failure to state a claim is that the zoning regulations were enacted pursuant to a comprehensive plan of community development and are therefore a proper exercise of the police power. There is no set formula, however, for determining where regulation ends and taking begins. It is essentially a question of reasonableness."

In *Vernon Park Realty* v. *City of Mount Vernon* (1954) 307 N.Y. 493 [121 N.E.2d 517, 519], the court answered such a contention in this manner: "While the common counsel [*sic*] has the unquestioned right to enact zoning laws respecting the use of property in accordance with a well-considered and comprehensive plan designed to promote public health, safety and general welfare, . . . such power is subject to the constitutional limitation that it may not be exerted arbitrarily or unreasonably, . . . and this is so whenever the zoning ordinance precludes the use of the property for any purpose for which it is reasonably adapted."

An expressed reason of the superior court, in sustaining one of the City's demurrers without leave to amend, was that "there cannot be stated a cause of action where there is not a physical taking." The City has made the same contention here. It also is invalid. *Klopping* v. *City of Whittier, supra,* 8 Cal.3d 39, 46 [104 Cal.Rptr. 1, 500 P.2d 1345], tells us that "before a de facto taking results there must be a "physical invasion or *direct legal restraint* . . . .' One example of a 'legal restraint' discussed in several California cases has been a particularly harsh zoning regulation, . . ." (Italics added.) *Candlestick Properties, Inc.* v. *San Francisco Bay Conservation etc. Com., supra,* 11 Cal.App.3d 557, 572, states: "Without question, an *undue* restriction . . . is as much a taking for constitutional purposes as appropriating or destroying it." (Italics in original.) *Bydlon* v. *United States* (1959) 175 F.Supp. 891, 899 [146 Ct. Cl. 764], holds: "It is no longer the rule that there must be a physical invasion of property to constitute a taking." (And see authority there cited.) "The modern, prevailing view is that any substantial interference with private property which destroys or lessens its value (or by which the owner's right to its use or enjoyment is in any substantial degree abridged or destroyed) is, in fact and in law, a 'taking' in the constitutional sense, to the extent of the damages suffered, even though the title and possession of the owner remains undisturbed." (2 Nichols on Eminent Domain (3d rev.ed. 1975) Taking and Damage, § 6.3, p. 65.)

█ Another reason stated by the superior court for one of its rulings, and relied upon by the City, was that plaintiff's "administrative remedies have not been exhausted."

The same argument was made, and found invalid, in *Dahl* v. *City of Palo Alto, supra,* 372 F.Supp. 647, 649, which it will be recalled dealt with the same foothills and ordinances and regulations here confronting us. The court said: "As to the lack of subject matter jurisdiction in this

Court, defendant makes two arguments. First, it urges the Court to refuse to exercise jurisdiction because of plaintiff's failure to exhaust available administrative remedies. Plaintiff has, however, made a claim for inverse condemnation in accordance with California Government Code § 905. The only other remedy referred to by defendant is plaintiff's failure to apply for a variance. It is highly improbable that a variance would, or legally could, be granted where as much land as here is involved (291 acres) and where development would be completely contrary to the goal of preserving the land in its natural or near natural state. The Court will not require such a useless course."

The court in *Sneed* v. *County of Riverside, supra,* 218 Cal.App.2d 205, 212, made a similar determination, stating: "Defendants contend plaintiff failed to exhaust his administrative remedies as a prerequisite to judicial relief; that he should have sought a permit from the Planning Commission with respect to nonconforming uses or variances . . . . In the instant case . . . it is not the plaintiff who has sought or obtained a change from what existed before, but the county which has invaded the alleged property rights of plaintiff, and in response thereto plaintiff does not challenge the constitutionality of the ordinance but merely seeks damages in inverse condemnation . . . ."

*Dooley* v. *Town Plan & Zon. Com'n of Town of Fairfield, supra,* 197 A.2d 770, 774, passed upon a like contention, saying: "Under the circumstances in the present case, it is not only unlikely but highly improbable that the zoning board of appeals would or legally could, by acting on an application for a variance, grant to the plaintiffs the relief which they seek. [Citations.] To grant a variance which would afford the plaintiffs any appreciable relief would seriously undermine the legislative purpose of the defendant in creating a flood plain district. An application for a variance would be doomed to almost certain failure. Such a useless course is unnecessary."

We have reached the same conclusion here.

From the foregoing considerations we conclude, and hold, that each of the plaintiffs' complaints stated a cause of action for damages in inverse condemnation against the City. It follows that the judgment of dismissal in each of the actions must be set aside.

As noted, plaintiff Beyer's action joined as defendants the City's council and the council members. The City urges that in any event those

defendants may not be held liable in damages in inverse condemnation or for costs in the action. We conclude that those defendants should remain as parties to the action, subject to any proper order of the court. They will not however be liable in damages, or for costs, in any judgment which may be entered.

■ It is pointed out by proof, of which we take judicial notice as requested, that following the judgment and his appeal therefrom, Beyer has conveyed title to the real property at issue to one Harrington. Harrington thereafter, with the City's authority, subdivided and built upon the property in accordance with the ordinances here under consideration. The City argues that Beyer has thus emasculated the "controlling and key allegation" of his complaint that the ordinances had substantially devalued and made unmarketable and confiscated his property. This controlling and key allegation nevertheless poses factual issues which should be resolved by the trier of fact, upon a trial. It *may be* that as a result of the ordinances' "undue restriction on the use of [the] property," or their "unreasonable, oppressive or discriminatory" effect, Beyer was obliged to unreasonably discount the sale price of his property because of the City's alleged taking. A somewhat similar situation arose in *Klopping* v. *City of Whittier, supra,* 8 Cal.3d 39, 58, where one of the plaintiffs, following the filing of his inverse condemnation action, lost his property through foreclosure. The court held that this "fortuity" did not preclude him from recovering such damages as he may in fact have suffered. We decline to dismiss the appeal of plaintiff Beyer as moot, as requested by the City.

We have closely considered each of the many detailed and incidental points and arguments made by the City in its briefs. None of them, in our opinion, tends to impugn the conclusions we have reached.

We do not in any way pass upon the weight or admissibility of evidence which may hereafter be offered by any of the parties; we simply hold that each of plaintiffs' complaints, with relevant matters judicially cognizable, stated facts sufficient, on theories of inverse condemnation, to successfully resist the City's general demurrers.

The judgments of dismissal are reversed. The superior court will set aside its orders sustaining the City of Palo Alto's demurrers without leave to amend. It will grant plaintiffs leave to amend their complaints if they shall be so advised, and will otherwise take further proceedings not

inconsistent with the views we have expressed. Plaintiffs Beyer and Eldridge will recover their costs of appeal from the City of Palo Alto.

Molinari, P. J., concurred.

**SIMS, J.**—I respectfully dissent.

In the first place I question whether the two cases of *Beyer* v. *City of Palo Alto* et al. (1 Civ. 34134) and *Eldridge* v. *City of Palo Alto* (1 Civ. 33517) should have been consolidated for appeal. It is true that each involves a claim that damages must be paid on the theory of inverse condemnation because of actions taken by the governing board of the city over a period of years prior to the filing of the complaint in each action, and that each of such claims is predicated on the same course of conduct by the city. On the one hand, however, Eldridge claims that the action of the city was proper under its police power, but nevertheless gave rise to a cause of action for damages. Beyer on the other hand claims that the action of the city exceeded the bounds of its authorized police power, and seeks, as alternative relief, a declaration that the regulatory ordinance of the city is illegal, unconstitutional and void. The latter claim raises many issues not raised by Eldridge. Moreover, the city has moved to dismiss Beyer's appeal because he has disposed of the land which is the subject of the city's regulatory ordinance.

In disposing of the *Beyer* case, the majority opinion reaches the paradoxical, illogical and unwarranted conclusion that since Beyer's property was taken by the city's exercise of its regulatory powers, he was entitled to compensation, but he was not entitled to secure an adjudication that the ordinance was invalid. That decision flies in the face of *Penna. Coal Co.* v. *Mahon* (1922) 260 U.S. 393 [67 L.Ed. 322, 43 S.Ct. 158, 28 A.L.R. 1321] on which the majority relies, and all of the cases which have recognized that a property owner is entitled to be relieved of the burden of a regulatory law or ordinance which so restricts the use of his property as to constitute a taking. (See fns. 2, 3 and 4 below.)

For the foregoing reasons I would treat the cases separately.

*Eldridge v. City of Palo Alto*

It is no secret that this case was heretofore the subject of a split decision of this court which was vacated by a grant of hearing by the Supreme Court. That court further ordered, "The cause is trans-

ferred to this court and retransferred to the Court of Appeal, First District, Division One, for reconsideration in the light of HFH, Ltd. v. Superior Court (1975) 15 Cal.3d 508." (Supreme Court Minutes, Jan. 21, 1976. Official Advance Sheets of the Supreme Court No. 5, Feb. 17, 1976, p. (1).)

In my opinion *HFH, Ltd.* does support the action of the lower court which sustained the demurrer in *Eldridge,* and my view that the judgment in favor of the city should be affirmed. I reluctantly must concede, however, that the decision leaves loopholes through which the plaintiff, as manifested from the present majority opinion, can pursue his claim for a cause of action in inverse condemnation.

It is clear that *HFH, Ltd.* holds (1) that inverse condemnation does not lie in zoning actions in which the complaint alleges mere reduction in market value (15 Cal.3d at pp. 513-518); (2) that plaintiffs may not seek damages in a mandate action for *interim* damages in the event they successfully secure an adjudication that the rezoning is invalid (*id.,* at pp. 518-520); and (3) that constitutional values of "fairness" do not require a ruling that inverse condemnation lies for any zoning action which reduces the market value of any tract of land, but that considerations of policy and the limitations of judicial instructions lead to a contrary conclusion (*id.,* at pp. 520-523). Nevertheless, the court in footnotes recognized that there were situations not covered by the facts as alleged in the cause of action in *HFH, Ltd.,* which was before the court.

The court stated, "Neither *Selby* [*Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110 (109 Cal.Rptr. 799, 514 P.2d 111)] nor this case presents the distinct problems arising from inequitable zoning actions undertaken by a public agency as a prelude to public *acquisition* (*Klopping* v. *City of Whittier* (1972) 8 Cal.3d 39 . . .; *Peacock* v. *County of Sacramento* (1969) 271 Cal.App.2d 845 . . .); or from zoning classifications invoked in order to evade the requirement that land *used* by the public must be acquired in eminent domain proceedings (*Sneed* v. *County of Riverside* (1963) 218 Cal.App.2d 205 . . .). Thus in *Klopping* the city in question made public announcements that it intended to acquire the plaintiff's land, then unreasonably delayed commencement of eminent domain proceedings, with the predictable result that the property became commercially useless and suffered a decline in market value. We held only that the plaintiff should be able to include in his eminent domain damages the decline in value attributable to this

unreasonable precondemnation action by the city. The case thus in no way resembles the instant one, in which plaintiffs make no allegations that the city intends to condemn the tract in question.

"Similarly in *Peacock* the county had refused to permit any development of the land in question (barring even the growth of most vegetation), while assuring the owner that the restrictions were of no consequence because the county intended to acquire the land for an airport. When, after denying the owner any use of his property for five years, the county renounced its intent to acquire the land, the Court of Appeal affirmed a trial court finding that ' "[t]he exceptional and extraordinary circumstances heretofore enumerated . . . constituted a take [*sic*] of the subject property by inverse condemnation." ' (271 Cal.App.2d at p. 854.) Again one sees that the downzoning rises to a taking only in connection with inequitable precondemnation actions by the public agency.

"Finally, the cases hold that a public agency may not use a zoning ordinance to evade the requirement that the state acquire property which it uses for public purposes. Thus in *Sneed,* the county, rather than acquiring land for an air navigation easement, simply enacted a zoning ordinance forbidding any structure or vegetation more than three inches high and proceeded to operate flights over the area thus restricted. The Court of Appeal held that the plaintiff had stated a cause of action in inverse condemnation. Unlike the instant case, *Sneed* involved a zoning ordinance creating an actual public use of the property." (15 Cal.3d at p. 517, fn. 14.) It also noted, "This case does not present, and we therefore do not decide, the question of entitlement to compensation in the event a zoning regulation forbade substantially *all* use of the land in question. We leave the question for another day." (*Id.,* p. 518, fn. 16.)

In *Eldridge,* and in *Beyer* as well, the plaintiff relied upon a course of conduct by the city which he claims brought his case within the exceptions noted above. In my judgment neither plaintiff has done so, but I do not believe either case may be summarily disposed of by reference to *HFH, Ltd.* v. *Superior Court.* I have accordingly reiterated what I said before in connection with *Eldridge* v. *City of Palo Alto,* with slight editorial changes, and added my views with respect to *Beyer* v. *City of Palo Alto,* et al.

A review of the record reflects that the plaintiff-landowner has stipulated himself out of court.[1] He contends that a valid exercise of the police power may give rise to an action for damages and that the plans, ordinances and actions of the city as alleged fall within that category. Nevertheless, with exceptions noted below, he relies upon authorities which, in reference to governmental action in the fields of planning and rezoning, hold that regulations which are confiscatory are invalid and not a proper exercise of the police power. By his refusal to seek declaratory relief,[2] mandate[3] or other recognized remedies for relief against govern-

---

[1]The complaint alleges that the plaintiff's real property had a fair market value of $4 million prior to the alleged taking. His prayer is for "compensation in the sum of $4,000,000.00; his costs, disbursements and expenses, including reasonable attorney, appraisal, and engineering fees actually incurred herein; legal interest thereon from the date of taking or damaging; and for such further relief as the Court deems proper."

In support of the complaint, plaintiff's attorney advised the trial court, "The validity and public purpose of defendant's transactions in implementing its Open-Space project is unquestioned." In his closing brief he states, ". . . appellant believes, as respondent does, that the States 1970-72 open-space legislation and respondents thereby enabled open-space activities pursued during the same period legally constitute a valid exercise of the police power."

At the hearing on the demurrer plaintiff's counsel requested that in the event the demurrer should be sustained he be granted leave to amend to put in "a tremendous amount of evidentiary factual material surrounding" the transactions involved. The order sustaining the demurrer without leave to amend was signed and filed on March 16, 1973, and judgment of dismissal was filed and entered March 26. On the same day plaintiff prepared, and on the following day filed, a notice of motion for reconsideration of ruling on demurrer. No date was noted for hearing but a request was made for setting a time and place convenient for the court. The notice states, "Said motion is made in the furtherance of justice and on the grounds that the Court should reconsider its ruling upon consideration of plaintiff's proposed amended complaint." It refers to a proposed amended complaint. No such complaint is attached to the notice of motion in the record, nor does plaintiff's request for a clerk's transcript designate any such proposed amended complaint as a part of the record. The city filed a memorandum in opposition, but so far as appeared from the record, no amended complaint was ever prepared, nor was the noticed motion, or any other motion seeking review of the order and/or judgment, ever brought on for hearing. There is no suggestion that plaintiff ever sought relief other than that set forth in his original prayer.

[2]See: *State of California* v. *Superior Court (Veta Company)* (1974) 12 Cal.3d 237, 250-252 and cf. 248-250 [115 Cal.Rptr. 497, 524 P.2d 1281]; *Consolidated Rock Products Co.* v. *City of Los Angeles* (1962) 57 Cal.2d 515, 517 [20 Cal.Rptr. 638, 370 P.2d 342]; *Beverly Oil Co.* v. *City of Los Angeles* (1953) 40 Cal.2d 552, 554 [254 P.2d 865]; and *Kissinger* v. *City of Los Angeles* (1958) 161 Cal.App.2d 454, 455 and 460 [327 P.2d 10]. Cf. *Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110, 117-118 and 126-127 [109 Cal.Rptr. 799, 514 P.2d 111].

[3]See *HFH, Ltd.* v. *Superior Court, supra,* 15 Cal.3d 508, 513, fn. 5 [125 Cal.Rptr. 365, 542 P.2d 237], and accompanying text; *State of California* v. *Superior Court (Veta Company), supra,* 12 Cal.3d 237, 244-248; *Selby Realty Co.* v. *City of San Buenaventura, supra,* 10 Cal.3d 110, 121-125 and 128; *G & D Holland Construction Co.* v. *City of Marysville* (1970) 12 Cal.App.3d 989, 992 [91 Cal.Rptr. 227]; *Candlestick Properties, Inc.* v. *San Francisco Bay Conservation etc. Com.* (1970) 11 Cal.App.3d 557, 562 [89 Cal.Rptr.

mental restrictions on the use of his property,[4] he has left himself without a remedy. He seeks to retain his property, which has not been subjected to any physical appropriation, or invasion, and to be compensated for it too.

I

The keystone of plaintiff's attack is found in *Penna. Coal Co.* v. *Mahon, supra,* 260 U.S. 393, where Justice Holmes in ringing words pronounced, "We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change. . . . [¶] We assume, of course, that the statute was passed upon the conviction that an exigency existed that would warrant it, and we assume that an exigency exists that would warrant the exercise of eminent domain. But the question at bottom is upon whom the loss of the changes desired should fall. So far as private persons or communities have seen fit to take the risk of acquiring only surface rights, we cannot see that the fact that their risk has become a danger warrants the giving to them greater rights than they bought." (260 U.S. at p. 416 [67 L.Ed. at p. 326].) The court, however, did not award the coal company compensation for the inroads which the state had made into the company's mining rights by legislation which purported to require that the company support the surface of land which it had granted subject to mineral rights, including the right to mine without liability for subsidence.[5] It

---

897]; *Munns* v. *Stenman* (1957) 152 Cal.App.2d 543, 556 [314 P.2d 67]; and *Bernstein* v. *Smutz* (1947) 83 Cal.App.2d 108, 113-114 [188 P.2d 48].

[4]See: *State of California* v. *Superior Court (Veta Company), supra,* 12 Cal.3d 237, 252 [injunction]; *Consolidated Rock Products Co.* v. *City of Los Angeles, supra,* 57 Cal.2d 515, 517 [injunction]; *Beverly Oil Co.* v. *City of Los Angeles, supra,* 40 Cal.2d 552,, 554 [injunction]; and *Metro Realty* v. *County of El Dorado* (1963) 222 Cal.App.2d 508, 509 [35 Cal.Rptr. 480] [review Bus. & Prof. Code, former § 11525, see § 11525.1].

[5]The lone voice of Justice Brandeis appears more attuned to modern concepts. He stated in dissent, ". . . where the police power is exercised, not to confer benefits upon property owners, but to protect the public from detriment and danger, there is, in my opinion, no room for considering reciprocity of advantage. There was no reciprocal advantage to the owner prohibited from using his oil tanks [citation]; his brickyard [citation]; his livery stable [citation]; his billiard hall [citation]; his oleomargarine factory [citation]; his brewery [citation]; unless it be the advantage of living and doing business in a civilized community. That reciprocal advantage is given by the act to the coal operators." (260 U.S. at p. 422 [67 L.Ed. at p. 329].) Concepts of what constitutes a civilized community are ever changing. Justice Lennon over 50 years ago recognized, "Thus it is apparent that the police power is not a circumscribed prerogative, but is elastic and, in keeping with the growth of knowledge and the belief in the popular mind of the need for its application, capable of expansion to meet existing conditions of modern life and thereby keep pace with the social, economic, moral, and intellectual

merely declared the legislation unconstitutional and reversed a decision of the Supreme Court of Pennsylvania which had directed that an injunction be issued against the coal company's violation of the regulation. It is clear from the decision that the confiscatory nature of the regulation is not grounds for a cause of action for damages, but the measure of the constitutional power to regulate.[6]

In *Beverly Oil Co.* v. *City of Los Angeles* (1953) 40 Cal.2d 552 [254 P.2d 865], the court recognized the essential distinction as follows: " . . . the very essence of the police power as differentiated from the power of eminent domain is that the deprivation of individual rights and property cannot prevent its operation, once it is shown that its exercise is proper and that the method of its exercise is reasonably within the meaning of due process of law." (40 Cal.2d at p. 557. See also *Consolidated Rock Products Co.* v. *City of Los Angeles* (1962) 57 Cal.2d 515, 530 [20 Cal.Rptr. 638, 370 P.2d 342].) In the case last cited the court referred with approval to decisions which indicated that the *Pennsylvania Coal Co.* case was inapplicable to comprehensive zoning (57 Cal.2d at p. 529).

II

Plaintiff alleges that he has not been able to find a single decided case passing on the compensability of a claimed taking by a particular local government application of a state mandated open-space conservation planning and zoning project. By stating the problem in such limited form he seeks to escape the general rules, reviewed below, that planning itself can give rise to no right of action, and that zoning, if not confiscatory, is not actionable merely because it precludes the most profitable use of

---

evolution of the human race." (*Miller* v. *Board of Public Works* (1925) 195 Cal. 477, 485 [234 P. 381, 38 A.L.R. 1479]. See also *Consolidated Rock Products Co.* v. *City of Los Angeles* (1962) 57 Cal.2d 515, 522 [20 Cal.Rptr. 638, 370 P.2d 342].)

[6]Holmes stated, "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. As long recognized, some values are enjoyed under an implied limitation and must yield to the police power. But obviously the implied limitation must have its limits, or the contract and due process clauses are gone. One fact for consideration in determining such limits is the extent of the diminution. When it reaches a certain magnitude, in most if not in all cases there must be an exercise of eminent domain and compensation to sustain the act. So the question depends upon the particular facts. The greatest weight is given to the judgment of the legislature, but it always is open to interested parties to contend that the legislature has gone beyond its constitutional power." (260 U.S. at p. 413 [57 L.Ed. at p. 325]. See also *Dobbins* v. *Los Angeles* (1904) 195 U.S. 223, 241 [49 L.Ed. 169, 177, 25 S.Ct. 18]; and *HFH, Ltd.* v. *Superior Court, supra,* 15 Cal.3d 508, 513-518.)

property. He also disavows finding a case passing on the compensability of government-compelled contribution of all development rights as a condition of owning undeveloped but developable land in the compelling jurisdiction. The absence of such authority is indicative that such action, if arbitrary and confiscatory, is to be attacked directly as unconstitutional, and, since it cannot bind the property, no compensation is in order unless the public body elects to proceed to condemn the interests which are so protected.

The problems posed by this case are not as ephemeral as plaintiff would have us believe. They may be resolved by examination of his contention that a continued series of cumulative regulatory activities prohibiting or "freezing" all private and beneficial use of private property, in the implementation of a local public project, gives rise to a right of action in inverse condemnation. Plaintiff seeks support for this position in a series of cases beginning with *Kissinger* v. *City of Los Angeles* (1958) 161 Cal.App.2d 454 [327 P.2d 10].

*Kissinger* was not a claim for damages, but an action for declaratory relief. The court recognized, ". . . it is the duty of the courts to set aside an ordinance which under the facts is clearly unreasonable and oppressive or discriminatory. [Citations.]" (161 Cal.App.2d at p. 460.) The court found that the ordinance in question restricted plaintiff's property alone, while it left all similarly situated property subject to the provisions of the comprehensive zoning ordinance which formerly controlled plaintiff's property (*id.,* at p. 460); that there had been no change in the character of the subject property or the surrounding area since the original zoning (*id.,* pp. 460-461); that the sole reason assigned for the exercise of the police power in rezoning the property was to prevent an undue congestion of population in the area and thus expose fewer people to the hazards arising from the operation of a nearby airfield, which hazards had existed at the time the property was originally zoned, and remained common hazards to other property within the flight pattern which was not rezoned; and that the city intended to condemn the property it had rezoned (*id.,* p. 461). The court concluded: "The inference is clear that the true purpose of the ordinance was to prevent the improvement of the subject property in order that it might be acquired at a lesser price for airport purposes" (*id.,* pp. 461-462); and "In short the ordinance arbitrarily rezoned the plaintiffs' property to a use to which it could not economically be put, lying as it does between multiple-dwelling development and commercial development and discriminates against the plaintiffs by preventing the use of

their property for the use for which it is best fitted, while permitting all other property similarly situated and zoned to be used as R-3 property." (*Id.,* pp. 462-463.) Insofar as this case is concerned, the court, in declaring the ordinance invalid, observed, "A zoning ordinance may not be used as a device to take property for public use without the payment of compensation. [Citations.]" (*Id.,* p. 462.) This would assist plaintiff if he was seeking a similar declaration and could show that the city was discriminating against his property to lower its value with the intent to condemn it for a park or other uses.[7] It in no way creates an election to sue the offending public body for damages.[8]

Plaintiff's next pillar is *Sneed* v. *County of Riverside* (1963) 218 Cal.App.2d 205 [32 Cal.Rptr. 318], in which the court found that the plaintiff had stated a cause of action for inverse condemnation under the following circumstances: ". . . the zoning law and the zoning ordinance

---

[7]Whether distinguished or applied *Kissinger* is generally limited to that principle. In *Selby Realty Co.* v. *City of San Buenaventura, supra,* 10 Cal.3d 110, the court distinguished *Kissinger,* referring to it as a case which "involved an unconstitutional attempt to rezone the plaintiff's property so that it could be acquired for a public use upon payment of a lower price." (10 Cal.3d at p. 120. See also *Morse* v. *County of San Luis Obispo* (1967) 247 Cal.App.2d 600, 604 [55 Cal.Rptr. 710]; *Smith* v. *County of Santa Barbara* (1966) 243 Cal.App.2d 126, 129-130 and 131 [52 Cal.Rptr. 292]; and *Metro Realty* v. *County of El Dorado, supra,* 222 Cal.App.2d 508, 516. Cf. *Klopping* v. *City of Whittier* (1972) 8 Cal.3d 39, 46 [104 Cal.Rptr. 1, 500 P.2d 1345]; *Aaron* v. *City of Los Angeles* (1974) 40 Cal.App.3d 471, 481 [115 Cal.Rptr. 162] [cert. den., 419 U.S. 1122 (42 L.Ed.2d 822, 95 S.Ct. 806)]; *People* ex rel. *Dept. Pub. Wks.* v. *Southern Pac. Trans. Co.* (1973) 33 Cal.App.3d 960, 965-966 [109 Cal.Rptr. 525]; *G & D Holland Construction Co.* v. *City of Marysville, supra,* 12 Cal.App.3d 989, 994; and *Peacock* v. *County of Sacramento* (1969) 271 Cal.App.2d 845, 856 [77 Cal.Rptr. 391].)

[8]It is established that the provisions of sections 818.4 and 821.2 of the Government Code immunize the public entity and the public employee from liability caused by the erroneous refusal to issue a permit where the issuance of such permit is discretionary. The person injured is limited to his action to require the issuance of the permit if discretion was abused. (*State of California* v. *Superior Court (Veta Company), supra,* 12 Cal.3d 237, 245-247; *Selby Realty Co.* v. *City of San Buenaventura, supra,* 10 Cal.3d 110, 127; and *O'Hagan* v. *Board of Zoning Adjustment* (1974) 38 Cal.App.3d 722, 728-732 [113 Cal.Rptr. 501].) Analogous provisions protect the public entity and the public employee from liability for an injury caused by the adoption or failure to adopt an enactment. (Gov. Code, § 818.2 and § 821. See *HFH, Ltd.* v. *Superior Court, supra,* 15 Cal.3d 508, 519-520; *Old Town Dev. Corp.* v. *Urban Renewal Agency* (1967) 249 Cal.App.2d 313, 334-335 [57 Cal.Rptr. 426].) Nor can a public employee be held liable for damages resulting from acts in good faith under an enactment which is unconstitutional, invalid or inapplicable. (Gov. Code, § 820.6. See *Brown* v. *City of Los Angeles* (1968) 267 Cal.App.2d 849, 851 [73 Cal.Rptr. 364].)

It is unnecessary to determine the applicability of the foregoing provisions to the facts upon which plaintiff Eldridge seeks to recover. They have not been referred to by either party, and for reasons set forth below it is otherwise clear that plaintiff has no action for damages. They were raised by the city in the *Beyer* case.

permit elimination of airport hazards in approaches to airports through the exercise of the police power 'to the extent legally possible' (Gov. Code, § 50485.2); where 'constitutional limitations' prevent the necessary approach protection under the police power, the necessary property right may be acquired by purchase, grant, or condemnation in the manner provided by law." (218 Cal.App.2d at p. 209.) The court observed, "The basic controversy is whether the Riverside County Ordinance is in reality a height limit ordinance authorized under the police power or whether it takes an air easement over plaintiff's property without payment of compensation therefor." (*Id.,* p. 208.) It stated, "We believe there is a distinction between the commonly accepted and traditional height restriction zoning regulations of buildings and zoning of airport approaches in that the latter contemplates actual use of the airspace zoned, by aircraft, whereas in the building cases *there is no invasion or trespass to the area above the restricted zone.*" (*Id.,* at p. 209, italics added.) It concluded: "In his complaint plaintiff seeks to set forth two bases upon which he is entitled to compensation, (1) upon an easement obtained through the ordinance, and (2) on the ground that large numbers of aircraft take off and land, fly at low altitudes over plaintiff's property pursuant to instructions from the employees of defendant county. We believe that a cause of action has been stated on each ground." (*Id.*) This is a far step from saying that a plan or rezoning which affects the value of a landowner's property is a taking when it is not accompanied by an invasion of his property. *Sneed* is generally limited to its factual situation.[9]

We approach a step closer to plaintiff's claim with *Peacock v. County of Sacramento* (1969) 271 Cal.App.2d 845 [77 Cal.Rptr. 391]. Here a judgment for the landowner in inverse condemnation was sustained. The opinion states, "The controversy centers upon the impact on plaintiffs' property rights of a series of actions taken by the Sacramento County Board of Supervisors, which actions were based upon what was initially an assumption and subsequently became a publicly stated intention that the county would eventually purchase Phoenix Field for use as a public aviation facility. The 'take' area with which we are concerned was

---

[9]See: *HFH, Ltd.* v. *Superior Court, supra,* 15 Cal.3d 508, 517, fn. 14; *Gisler* v. *County of Madera* (1974) 38 Cal.App.3d 303, 306 [112 Cal.Rptr. 919]; *Turner* v. *County of Del Norte* (1972) 24 Cal.App.3d 311, 315 [101 Cal.Rptr. 93]; and *Morse* v. *County of San Luis Obispo, supra,* 247 Cal.App.2d 600, 603-604. Cf. *Klopping* v. *City of Whittier, supra,* 8 Cal.3d 39, 46; *Aaron* v. *City of Los Angeles, supra,* 40 Cal.App.3d 471, 481; *People* ex rel. *Dept. Pub. Wks.* v. *Southern Pac. Trans. Co., supra,* 33 Cal.App.3d 960, 965-966; *City of Oakland* v. *Nutter* (1970) 13 Cal.App.3d 752, 763 and 769, fn. 14 [92 Cal.Rptr. 347]; and *Peacock* v. *County of Sacramento, supra,* 271 Cal.App.2d 845, 858 and 861.

included in that additional property which the county would have had to purchase in order to operate the facility in accordance with their expressed plans. The activities of the board, involved in this case, commenced in 1958 and had not been concluded at the time the subject proceeding was initiated." (271 Cal.App.2d at p. 847.) Neither the trial court nor the reviewing court found all of these activities actionable. The opinion points out, "Significantly, the trial court did not find that any of the county's enactments or actions, standing alone, constituted inverse condemnation. Rather, the court agreed with the position of the county at trial that Ordinance 697 was enacted as and was an interim study ordinance, and that the period between its enactment and the adoption of the general plan for Phoenix Field was a reasonable time for completion of such study. Nor did the court hold that the rezoning of the property in June of 1963 furnished a basis for relief, although of the five private airports referred to in the Leigh-Fisher reports only property adjacent to Phoenix Field was so reclassified. [Citation.] Further, the court did not consider the enactment and adoption of the general plan, *per se,* as constituting inverse condemnation, but reached its conclusion partly on the basis of the continuation of the restrictive measures beyond what was found to be a reasonable time for their existence." (271 Cal.App.2d at p. 856.) In distinguishing *Metro Realty* v. *County of El Dorado* (1963) 222 Cal.App.2d 508 [35 Cal.Rptr. 480], and *Morse* v. *County of San Luis Obispo* (1967) 247 Cal.App.2d 600 [55 Cal.Rptr. 710], the court highlighted the significant factors which led it to affirm that there was a taking on November 13, 1963, when the county adopted a general plan continuing the restrictions it had adopted before, and thereafter authorized the prosecution of the plan including negotiations for the purchase of the property involved. (See 271 Cal.App.2d at pp. 849-850 and 855.) In *Peacock,* as in *Sneed,* the plaintiff was singled out as a lonely object of regulation, the ordinance was not of general application as in *Metro.* Peacock's lands were usable and subdividable, and attempts to secure approval of a subdivision map had been thwarted by the county, whereas in *Metro* the lands were unused and unusable, and no subdivisions were located in the vicinity. In the latter case the restrictions were temporary and had not jelled into permanency. In *Peacock* there was, as in *Sneed,* an attempt to take the airspace without compensation. Moreover, there was an express purpose (later revoked) to take the particular property involved and to affect the value of that property by the restrictions. (See 271 Cal.App.2d at pp. 859-863.)

As a result, *Peacock* has been referred to by the Supreme Court as a case which "upheld a claim of inverse condemnation because the county

had announced its intention to condemn plaintiff's land for an airport, rezoned and restricted the use of that property so that its value would be depressed in the event of future public acquisition, refused permission to subdivide, and finally abandoned the airport project altogether." (*Selby Realty Co.* v. *City of Buenaventura* (1973) 10 Cal.3d 110, 120 [109 Cal.Rptr. 799, 514 P.2d 111]. See also *HFH, Ltd.* v. *Superior Court, supra,* 15 Cal.3d 508, 508, 517, fn. 14; *Klopping* v. *City of Whittier* (1972) 8 Cal.3d 39, 44 and 46 [104 Cal.Rptr. 1, 500 P.2d 1345]; *Aaron* v. *City of Los Angeles* (1974) 40 Cal.App.3d 471, 481 [115 Cal.Rptr. 162]; *Turner* v. *County of Del Norte* (1972) 24 Cal.App.3d 311, 315 [101 Cal.Rptr. 93]; and *Candlestick Properties, Inc.* v. *San Francisco Bay Conservation etc. Com.* (1970) 11 Cal.App.3d 557, 572 [89 Cal.Rptr. 897]. Cf. *Gisler* v. *County of Madera* (1974) 38 Cal.App.3d 303, 306 [112 Cal.Rptr. 919]; and *People* ex rel. *Dept. Pub. Wks.* v. *Southern Pac. Trans. Co.* (1973) 33 Cal.App.3d 960, 965-966 [109 Cal.Rptr. 525].)

*Klopping* v. *City of Whittier, supra,* 8 Cal.3d 39, is a case of similar tenor. There the court ruled, "Accordingly we hold that a condemnee must be provided with an opportunity to demonstrate that (1) the public authority acted improperly either by unreasonably delaying eminent domain action following an announcement of intent to condemn or by other unreasonable conduct prior to condemnation; and (2) as a result of such action the property in question suffered a diminution in market value." (8 Cal.3d at p. 52.) In *Selby Realty Co.* v. *City of San Buenaventura, supra,* the court observed, "Neither *Klopping* nor any other decision of which we are aware holds that the enactment of a general plan for the future development of an area, indicating potential public uses of privately owned land, amounts to inverse condemnation of that land." (10 Cal.3d at p. 119. See also *HFH, Ltd.* v. *Superior Court, supra,* 15 Cal.3d 508, 517, fn. 14; *Navajo Terminals, Inc.* v. *San Francisco Bay Conservation & Development Com.* (1975) 46 Cal.App.3d 1, 4 [120 Cal.Rptr. 108]; *Redevelopment Agency* v. *Del-Camp Investments, Inc.* (1974) 38 Cal.App.3d 836, 842 [113 Cal.Rptr. 762]; and *People* ex rel. *Dept. Pub. Wks.* v. *Southern Pac. Trans. Co., supra,* 33 Cal.App.3d 960, 965.)

*People* ex rel. *Dept. Pub. Wks.* v. *Southern Pac. Trans. Co., supra,* 33 Cal.App.3d 960, states, "Since the condemnee has its rights of recovery against the city, there is no compelling need that the same damage be compensated in the eminent domain proceeding brought by the state." (33 Cal.App.3d at p. 966.) That statement is predicated on the premise, "A zoning restriction imposed to depress value with a view to future

eminent domain proceedings itself creates a cause of action in inverse condemnation against the governmental unit enacting the zoning ordinance. [Citations.] The zoning restriction may be invalidated by a direct attack. [Citation.]" (33 Cal.App.3d at p. 966.) In my opinion the Court of Appeal erred in not permitting the trial court to determine the validity of the city zoning in the action by the state, just as a party may introduce evidence tending to show the possibility of a higher zoning permitting greater value. The court has attempted to shift the cost of the state improvement to the city taxpayers, when in fact the state, and not the city, acquired the property. If the zoning had been contested before the action and declared invalid, the state would have been forced to pay the full price.

In *Dahl* v. *City of Palo Alto* (N.D.Cal. 1974) 372 F.Supp. 647, the plaintiff sought damages by reason of the same actions of the city as are the subject of the complaint in this case. The court held that allegations that the regulation imposed by the city "is arbitrary and capricious and that it allows no reasonable use of plaintiff's property" were sufficient to raise a factual issue as to whether the zoning regulations were a proper exercise of the police power. (372 F.Supp. at pp. 648-649.) With this I can agree, and it would be applicable here if the plaintiff had not stipulated to the contrary.

The district court also found that there were sufficient allegations to establish that the moratorium on the use of her land constituted a taking under principles enunciated in *Peacock* v. *City of Sacramento, supra.* For reasons set forth herein, I cannot reach a similar conclusion in this case. That court also found that there were facts alleged which created an equitable estoppel against the city sustaining the plaintiff's claim of breach of contract and misrepresentation (*id.,* p. 649). With respect to the claim that the plaintiff had not exhausted her administrative remedies the court observed that a claim had allegedly been filed, and that the allegations reflected that it would be a useless course to require the landowner to seek a variance. (*Id.*)

The opinion fails to confront the issue of whether the plaintiff's recourse is limited to having the regulation invalidated and her property restored to its former status. It assumes that there was a taking despite the alleged improper exercise of the regulatory power. I, therefore, find the opinion unpursuasive and inconsistent with the opinions of the Supreme Court of this state which have denied a right to inverse condemnation under similar circumstances.

In *Arastra Limited Partnership* v. *City of Palo Alto* (N.D.Cal. 1975) 401 F.Supp. 962, the federal court again upheld a landowner's right to recover damages for inverse condemnation on the basis of the actions of the City of Palo Alto, many of which have a common effect on the lands of Eldridge and of Beyer. In my opinion the complaint in this action fails to fall within the framework of that case because plaintiff has failed to allege that he ever had initiated or secured approval of any development plan which was foreclosed by the series of actions taken by the city, or that the city ever designated his particular parcel for acquisition to the extent shown in the cited case. Moreover, in my opinion the district court erred in not relegating the landowner to his right to develop the property under the prior zoning if, as it found, the new zoning was confiscatory. I express no opinion as to whether under the circumstances related in the cited case, the landowner would be entitled to some compensation under *Klopping* for the period commencing with the determination to take its property and terminating with the abandonment of that type of action.

Other cases which recognize an action for inverse condemnation where the plaintiff's property has been physically invaded, or has been diminished in value because of actual use of the airspace,[10] are not controlling or pursuasive on the issues raised by the plaintiff's complaint.

## III

According to the complaint, plaintiff's property consists of an undeveloped parcel of approximately 750 contiguous acres on Skyline Boulevard and Page Mill Road in the San Francisco peninsula foothills overlooking San Francisco Bay. He acquired the property March 15, 1968, for the sum of $2,050,000, plus assumption of an assessment balance of $406,662.38 for municipal sewer and water utilities which had

---

[10] See *Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925-928 [101 Cal.Rptr. 568, 496 P.2d 480]; *Holtz* v. *Superior Court* (1970) 3 Cal.3d 296, 302-311 [90 Cal.Rptr. 345, 475 P.2d 441]; *Albers* v. *County of Los Angeles* (1965) 62 Cal.2d 250, 261-264 [42 Cal.Rptr. 89, 398 P.2d 129]; *House* v. *L. A. County Flood Control Dist.* (1944) 25 Cal.2d 384, 391 [153 P.2d 950]; *Aaron* v. *City of Los Angeles, supra,* 40 Cal.App.3d 471, 477-484 and 493; *City of Oakland* v. *Nutter, supra,* 13 Cal.App.3d 752, 765-768; and *Beckley* v. *Reclamation Board* (1962) 205 Cal.App.2d 734, 747-748 [23 Cal.Rptr. 428].) Allegations that the city, without the permission of plaintiff, constructed certain access improvements of plaintiff's property, are admittedly without foundation, and are not themselves relied upon by plaintiff as giving him right to a cause of action for inverse condemnation, because no claim was filed for any specific damage so occasioned.

been financed by an assessment district in 1963,[11] four years after the city in 1959 had annexed an area of approximately 6,000 acres of which the property subsequently purchased by plaintiff was a part. At the time of the annexation of the property, the improvements on the property were limited to some old ranch buildings, electric and telephone utility service and public road on two sides. There is no mention that any improvements other than those mentioned above were constructed before or after the acquisition by plaintiff. At the time of acquisition the property was zoned R-E:A (Residential Estate—Agricultural) for low density single-family residential development on minimum one-acre lots with one primary dwelling unit per lot. The plaintiff purchased the property for the purposes of long term investment and planned development, intending to make use of its many rolling hills, wooded glens and spectacular panoramic views of the entire San Francisco Bay area.

The gravamen of plaintiff's complaint is found in allegations that a series of public acts and transactions commencing in 1969, and "in particular those of defendant CITY occurring between February 28, 1972, and August 14, 1972, constitute a taking of plaintiff's private property for public use as permanent open space without prior payment of just compensation as required by Article I, section 14, of the Constitution of the State of California." A second cause of action seeks recovery under the Fifth and Fourteenth Amendments to the Constitution of the United States, and alleges, "Said series of acts and transactions of defendant CITY have devalued plaintiff's land by more than three-fourths of its fair market value and to substantially below its actual cost, which is a wholly unreasonable degree in that it is thus impossible to reasonably develop the said property with a fair return or otherwise." A third cause of action alleges, "Said series of acts and transactions of the defendant CITY amount to a damaging according to proof of plaintiff's private property for public use without just compensation having first been paid, in violation of Article I, Section 14, of the Constitution of the State of California." Plaintiff seeks $4 million which he alleges was the fair market value of his property prior to the alleged taking. Claim for damages was made to the city as required by law on September 14, 1972, and the action was filed December 18, 1972, after the city failed to act on the claim.

---

[11]The complaint alleges that on October 10, 1972, following rezoning of the property (see text below), the amount of the assessment was reduced to one-third of the original amount, $451,734.29, by the city.

The acts complained of fall into three categories—planning, moratorium on development, and rezoning. The complaint alleges that in 1969 the city commenced a series of environmental and land use studies; that in 1970 the city began to publicly discuss the purchase of foothill properties for the preservation of open space; that on June 7, 1971, the city adopted an amendment to its general plan reclassifying over 90 percent of the undeveloped foothills (over 5,900 acres, including plaintiff's property) to "Open Space and/or Conservation and Park" uses; that on April 17, 1972, the general plan was amended by the addition of an open space element.[12] Plaintiffs also recognize that in 1970 the state Legislature mandated the preparation of such plans. (See Gov. Code, §§ 65560-65570, particularly § 65563, as adopted Stats. 1970, ch. 1590, § 15, p. 3316.)[13]

*Selby Realty Co.* v. *City of San Buenaventura, supra,* makes it clear that the adoption of a plan itself, even though it may designate areas to be appropriated for public use in the future, gives no right of action for inverse condemnation. The court rejected such a contention as follows: "The deleterious consequences of haphazard community growth in this state and the need to prevent further random development are evident to even the most casual observer. The Legislature has attempted to alleviate the problem by authorizing the adoption of long-range plans for orderly progress. Thus, it has provided not only for the adoption of general plans but also regional plans (§ 65060 et seq.), specific plans (§ 65450 et seq.), district plans (§ 66105 et seq.), and a comprehensive plan for the conservation of San Francisco Bay (§ 66650 et seq.). In addition, the

---

[12]Plaintiff has requested that the court take judicial notice of a "Staff Report on Regulation to Preserve Foothill Open-Space" prepared by the Director of Planning and Community Development of the City of Palo Alto because it reflects the basis for the action of the planning commission and city council of which plaintiff complains. Recognition and perusal of the report does not affect the legal principles discussed in these provisions. It would only be material on the issue of determining whether or not the zoning, which plaintiff concedes is valid, is constitutional; an issue I would not reach on this record.

[13]Plaintiff also refers to section 65912 of the Government Code which provides with respect to open-space zoning, as follows: "The Legislature hereby finds and declares that this article is not intended, and shall not be construed, as authorizing the city or the county to exercise its power to adopt, amend or repeal an open-space zoning ordinance in a manner which will take or damage private property for public use without the payment of just compensation therefor. This section is not intended to increase or decrease the rights of any owner of property under the Constitution of the State of California or of the United States."

As pointed out above and below plaintiff has expressly elected not to question the validity of the zoning ordinance, nor to seek to have his property relieved of any unconstitutional restraint.

voters recently passed an initiative measure providing the mechanism for adoption of plans to preserve and protect the state's coastline. (Pub. · Resources Code, § 27000 et seq.)

"If a governmental entity and its responsible officials were held subject to a claim for inverse condemnation merely because a parcel of land was designated for potential public use on one of these several authorized plans, the process of community planning would either grind to a halt, or deteriorate to publication of vacuous generalizations regarding the future use of land. We indulge in no hyperbole to suggest that if every landowner whose property might be affected at some vague and distant future time by any of these legislatively permissible plans was entitled to bring an action in declaratory relief to obtain a judicial declaration as to the validity and potential effect of the plan upon his land, the courts of this state would be inundated with futile litigation. It is clear, under all the circumstances, that plaintiff has not stated a cause of action against the county defendants for either declaratory relief or inverse condemnation." (10 Cal.3d at pp. 120-121, see also pp. 127-128; and *HFH, Ltd.* v. *Superior Court, supra,* 15 Cal.3d 508, 516; and *Navajo Terminals, Inc.* v. *San Francisco Bay Conservation & Development Com., supra,* 46 Cal.App.3d 1, 3-5; and *Hilltop Properties* v. *State of California* (1965) 233 Cal.App.2d 349, 354-361 [43 Cal.Rptr. 605, 37 A.L.R.3d 109].)

Nor did the delays attendant to the adoption of the plan and the ensuing zoning ordinance give rise to a cause of action. At any time up to the effective date of the moratorium ordinance adopted July 1971, the plaintiff could have applied for all permits necessary for the development of his property, and in the absence of any contrary legislation had a right to secure them. The subsequent delays during the planning process gave rise to no cause of action. In *Miller* v. *Board of Public Works* (1925) 195 Cal. 477 [234 P. 381, 38 A.L.R. 1479], the court pointed out, "It is a matter of common knowledge that a zoning plan of the extent contemplated in the instant case cannot be made in a day. Therefore, we may take judicial notice of the fact that it will take much time to work out the details of such a plan and that obviously it would be destructive of the plan if, during the period of its incubation, parties seeking to evade the operation thereof should be permitted to enter upon a course of construction which might progress so far as to defeat in whole or in part the ultimate execution of the plan." (195 Cal. at p. 496.) Recognition of that necessity has often been applied to sustain moratoria on development and construction activity without compensation to the owner. (See Gov. Code, § 65858 [former § 65804]; *State of California* v.

*Superior Court (Veta Company)* (1974) 12 Cal.3d 237, 252-255 [115 Cal.Rptr. 497, 524 P.2d 1281]; *Candlestick Properties, Inc.* v. *San Francisco Bay Conservation etc. Com., supra,* 11 Cal.App.3d 557, 570-573; *Metro Realty* v. *County of El Dorado, supra,* 222 Cal.App.2d 508, 511-519; and *Hunter* v. *Adams* (1960) 180 Cal.App.2d 511, 523-524 [4 Cal.Rptr. 776].)

The fact, as alleged, that on April 17, 1972, the city authorized the purchase of 43 acres of privately owned foothills land for open space at a price of approximately $12,000 an acre is of no significance. According to the complaint 6,000 acres are involved, and no particular 43 acres are designated in the complaint. Five thousand nine hundred acres were classified as for "Open Space and/or Conservation and Park" uses on June 7, 1971. Such a classification was certainly not directed to the 43 acres, much less directly at plaintiff's 750 acres. Plaintiff allegedly acquired the property at a gross price of about $3,275 per acre on March 15, 1968. He claims damages of approximately $5,333 per acre, whether for the whole of his property, or solely for the alleged restrictions on the use of his property is not clear. In any event, the $12,000 per acre offered by the city in no way shows a studied attempt at planning, moratorium and rezoning to drive down the price of property.

The kernel of plaintiff's complaint must be the rezoning which on June 5, 1972, added open space regulations to the zoning code, and on August 14, 1972, classified plaintiff's property in that category. This changed the classification of the property from "R-E:A (Residential Estate—Agricultural), for low-density single-family residential development on minimum one-acre lots with one primary dwelling unit per lot" to "O-S (Open Space)." Under the new zoning "construction of one-family dwellings on the property . . . is expressly limited to 10-acre minimum lots with a maximum of impervious area and building coverage of 3.5 per cent. . . ." Uses are limited to "(1) Public recreation (2) Enjoyment of scenic beauty (3) Conservation of use of natural resources (4) Production of food or fiber (5) Protection of man and his artifacts (buildings, property, etc.) (6) Containment and structuring of urban development."

There may well be a justiciable issue as to whether this zoning meets the test of the regulatory power as limited in *Penna. Coal Co.* v. *Mahon, supra.* Plaintiff has alleged, "The aforesaid acts and transactions of defendant CITY have deprived plaintiff of all private uses of his said property and appropriated his private property rights therein" and "The

aforesaid acts and transactions of defendant CITY have deprived plaintiff of any reasonable or economically feasible use of his said property." These statements are legal conclusions and not allegations of ultimate fact. (See *Hilltop Properties* v. *State of California, supra,* 233 Cal.App.2d 349, 354.) Nevertheless they contain the germ of facts which might render the new ordinance invalid if it can be shown to be confiscatory. (See *G & D Holland Construction Co.* v. *City of Marysville* (1970) 12 Cal.App.3d 989, 994-997 [91 Cal.Rptr. 227]; *Munns* v. *Stenman* (1957) 152 Cal.App.2d 543, 552-555 [314 P.2d 67]; and *Bernstein* v. *Smutz* (1947) 83 Cal.App.2d 108, 117-125 [188 P.2d 48]. Cf. *Consolidated Rock Products Co.* v. *City of Los Angeles, supra,* 57 Cal.2d 515, 530-532; *McCarthy* v. *City of Manhattan Beach* (1953) 41 Cal.2d 879, 890 [264 P.2d 932]; *Gisler* v. *County of Madera, supra,* 38 Cal.App.3d 303, 307-309; *Morse* v. *County of San Luis Obispo* (1967) 247 Cal.App.2d 600, 602-603 [55 Cal.Rptr. 710]; *Smith* v. *County of Santa Barbara* (1966) 243 Cal.App.2d 126, 132 [52 Cal.Rptr. 292]; *Anderson* v. *City Council* (1964) 229 Cal.App.2d 79, 88-90 [40 Cal.Rptr. 41]; and *Mang* v. *County of Santa Barbara* (1960) 182 Cal.App.2d 93, 101-102 [5 Cal.Rptr. 724].)

The combination of the moratorium, plan and rezoning does not establish an illegal whole which entitles the plaintiff to relief despite the legality of its parts. Nor is he aided by the allegation that more than two months after he filed his claim the city publicly announced "that the open space rezoning enacted on said August 14, 1972, 'signified that one of Palo Alto's greatest assets—its green and golden foothills—would be conserved as backdrop to the city for generations to come,' " and declared " 'the 1,400 acres which the City owns in Foothills Park and a public trails and path system, which is being designed for the foothills, will allow Palo Altans to enjoy the open space.' " If the plaintiff's property is condemned for parks, trails or paths, or if the city attempts to use it for such purposes without condemnation he has his legal remedies, and in an action for condemnation, direct or indirect, he may assert his contention that the property is illegally zoned and seek compensation on a value free from the zoning. He also had the right to seek a declaration that the actual restrictions placed on his property were illegal, or, in the alternative, a right to seek to force the city to permit him to develop his property in a manner consistent with the prior zoning. He has elected not to pursue those remedies. (See fn. 1 above.) He is not entitled to compensation on the facts alleged in his complaint. (See *HFH, Ltd.* v. *Superior Court, supra,* 15 Cal.3d 508, 513-523; *State of California* v. *Superior Court (Veta Company), supra,* 12 Cal.3d 237, 252-255; and *Selby*

*Realty Co.* v. *City of San Buenaventura, supra,* 10 Cal.3d 110, 118, 121 and 127-128.)

The trial court properly sustained the demurrer to the complaint on the ground that no cause of action was stated for inverse condemnation. Plaintiff's failure to attack the zoning ordinance directly renders it unnecessary to determine whether he has alleged facts sufficient to show that it was not a valid exercise of the police power, and I express no opinion on that ground, or on the issue of whether plaintiff should have applied for a variance before so attacking the ordinance. Because plaintiff so restricted his prayer and failed to produce, on rehearing, any amended complaint, there was no error in denying his request to amend. I would affirm the judgment in *Eldridge* v. *City of Palo Alto.*

*Beyer v. City of Palo Alto et al.*

For the reasons set forth above I am of the opinion that the plaintiff in this action failed to set forth facts sufficient to constitute a cause of action to recover damages for inverse condemnation. He did, however, unlike Eldridge, seek a declaration that the open space ordinance was illegal, unconstitutional and void. Those allegations suggested many interesting issues which have been thoroughly briefed by the litigants and two *amici curiae.*[14] Because of intervening developments brought to the attention of the court by the city's motion to dismiss the appeal as moot, it is, in my opinion, unnecessary to reach those issues.

The judgment of dismissal was entered July 12, 1973, and Beyer appealed on July 25, 1973. The city has asked us to, and I do, take

---

[14]Among the arguments raised by Beyer, in support of his contention that the open space zoning ordinance is illegal, unconstitutional and void, are the following: It will not and cannot achieve its legislative objective of preserving open space; it forces the 17 persons who owned the land so restricted to furnish benefits of open space to the public without compensation; it conflicts with the State of California's open space zoning laws; it is inconsistent with the City of Palo Alto General Plan; it was improperly enacted to reduce the price of land to be acquired by the city or by a regional park district; it benefits the wealthy and excludes housing for low and moderate income people; and because of exceptional circumstances the city is estopped to adopt such restrictive zoning. One *amicus curiae* has supported the theory that the ordinance is invalid because it excludes low and moderate cost housing in an area of need, and unconstitutionally discriminates against persons with low incomes and unconstitutionally impinges on the right to travel. (See *Construction Ind. Ass'n. of Sonoma Co.* v. *City of Petaluma* (9th Cir. 1975) 522 F.2d 897, 904-905 and 905-909, particularly fn. 16, p. 908 [cert. den. 2/23/76 424 U.S. 934 (47 L.Ed.2d 342, 96 S.Ct. 1148-1149)]. Cf. *Concord Township Appeal* (1970) 439 Pa. 466, 470-476 [268 A.2d 765, 766-770], with *Just* v. *Marinette County* (1972) 56 Wis.2d 7, 14-18 [201 N.W.2d 761, 767-768].)

judicial notice of certain public records which indicate that by deeds dated April 3, 1974, and recorded May 8, 1974, the Beyer property was conveyed to one Harrington. Prior thereto on March 11, 1974, Harrington had secured approval of the city council for his application to divide the property into two lots. Thereafter on May 13, 1974, the council, upon recommendation of the planning commission approved Harrington's application for site and design approval of a single family residence on one of the lots. On August 12, 1974, a building permit was issued to him and thereafter various inspections of the work were made and supplementary permits issued. Meanwhile, by deed dated June 24, 1974, and recorded January 20, 1975, Harrington conveyed away a portion of the property. Neither Harrington nor his grantees have intervened or been substituted in the Beyer's action, and for all that appears they are satisfied to have acquired and developed the property under the open space zoning.

Beyer does not contest the foregoing facts, but he claims he is still entitled to a declaration that the ordinance is invalid. He relies upon *Millbrae Assn. for Residential Survival* v. *City of Millbrae* (1968) 262 Cal.App.2d 222 [69 Cal.Rptr. 251], wherein this court observed, in connection with a similar motion, "[W]hen one acts under compulsion or coercion in compliance with a judgment, he does not lose his right of appeal from that judgment." (262 Cal.App.2d at pp. 232-233.) There is nothing in the record except a bare statement in plaintiff's reply brief to show that he was under compulsion to sell his land to realize cash in order to meet his debts and remain solvent. In the case cited it also appeared that there was a continuity of interest between the vendor and vendee, and that the former had undertaken to continue the litigation for the benefit of the latter (*id.,* at p. 232). No such showing was made here. It would appear that the plaintiff no longer has a pecuniary or other interest in having the open space zoning declared unconstitutional, illegal and void. (See *Goldman* v. *County of Santa Barbara* (1962) 203 Cal.App.2d 454, 456-458 [21 Cal.Rptr. 532].)

Plaintiff also seeks to equate his position with plaintiff Sarff in *Klopping* v. *City of Whittier, supra,* 8 Cal.3d 39. Sarff filed his suit in inverse condemnation on March 26, 1968, and lost his property through foreclosure the following May 16. The court stated, "Certainly this fortuity does not preclude him from recovering for any damages caused by the city in making the two announcements in question. Sarff complains that he was unable to rent the property in the period following the precondemnation announcements. Under the rules discussed above

rental loss is a proper element of recovery. In the petition for hearing filed herein, it also appears that he seeks recovery for damages occasioned by the fact that his property was ultimately foreclosed because the condemnation resolution prevented him from deriving income from his land in order to make mortgage payments. The availability of this element of damage can be more fully explored on remand." (8 Cal.3d at p. 58.) As we have seen, *Klopping* involves the depressive effect of improper steps toward condemnation. Beyer has failed to show that the city was attempting to condemn his property. He claims damages from the moratoria and the ultimate open space zoning. No damages may be recovered on either ground. (*Selby Realty Co.* v. *City of San Buenaventura, supra,* 10 Cal.3d 110, 118-119; and *HFH, Ltd.* v. *Superior Court, supra,* 15 Cal.3d 508, 513-523.)

I would, therefore, dismiss the *Beyer* appeal because events occurring after the judgment have rendered the appeal moot. (See *Goldman* v. *County of Santa Barbara, supra,* 203 Cal.App.2d 454, 457-458.)

The petition of respondent City of Palo Alto for a hearing by the Supreme Court was denied July 15, 1976. Wright, C. J., Tobriner, J., and Mosk, J., were of the opinion that the petition should be granted.